## LANDON *against* the town of LITCHFIELD.

In *April*, 1719, the proprietors of the territory embraced by the present town of *L.* granted to the first settlers of that town, among other lands constituting the plantation, " three home lots, with other divisions of land to be laid out thereunto, to be and remain for the uses following, and to no other use and purpose whatsoever, *viz.* one home lot, with the divisions and commons thereunto pertaining, to be given and granted to the minister that shall be first ordained in the plantation, to be and remain to him and his heirs forever: one lot, with the divisions and commons, to be and remain to and for the use and improvement of the said first minister, and his successors in the work of the ministry in the said place: and the other of the said three lots to be and remain forever, to be improved, by the inhabitants of the said plantation, to the best advantage, for the support and maintenance of the school for the well educating of the children of the said place." In 1753, the town of *L.*, being one ecclesiastical society, leased the land described in the second clause to *C*, the clergyman recently settled there, for 999 years, in payment of his settlement. *C* accepted the lease, and held possession under it until his death, in 1810. He devised it to *D*, who went immediately into possession. From 1811 to 1832 inclusive, *D* voluntarily put this land into his assessment list, and paid taxes upon it, without objection. In 1833, it was assessed and taxed, without the assent of *D*, and in opposition to a claim by him, that it was exempt from taxation. In an action of *assumpsit*, brought by *D*, against the town of *L.*, to recover the amount of the tax collected of him, it was held, 1. that the lot in question was granted for the maintenance of the ministry of the gospel, within the meaning of the statute of 1702 exempting estates given *in pios usus* from taxation; 2. that the repeal of such statute, at the revision in 1821, was inoperative, as to this grant, being repugnant to the constitution of the *United States*, as impairing the obligation of a contract; 3. that the lease of the lot to *C*, for 999 years, in payment of his salary, was not a diversion of it from the use to which it was intended; 4. that a trust was created in regard to this lot, and the town of *L.* was the party beneficially interested and the trustee, and was, of course, capable of making the lease; 5. that *D*, consequently, had a valid title under the original grant; 6. that the payment of taxes by *D*, for twenty years, did not destroy his right of exemption, or preclude him from insisting on it; consequently, that he was entitled to recover.

THIS was an action of *assumpsit* for money had and received, by the defendants, for the plaintiff's use; for money paid, laid out and expended, by the plaintiff, for the use of the defendants; and for money due from the defendants to the plaintiff, and unpaid. The object of the suit was to recover back a sum of money, which had been collected, by the defendants from the plaintiff, by virtue of a tax warrant against him.

The cause was tried at *Litchfield, August* term, 1835, before *Waite*, J.

*Litchfield,*
*June, 1836.*

*Landon*
*v.*
*Litchfield.*

The only question was, whether certain real estate in the town of *Litchfield*, in the plaintiff's possession, which had been taxed by that town, was, or was not, exempt from taxation, by the statute of 1702, relating to property given to charitable uses. This estate was, by the assessors, put into the assessment list, in 1833, without the assent of the plaintiff, and in opposition to a claim by him that he was not liable to be assessed for it; and upon appeal to the board of relief, it was retained in such list; and a tax was laid upon it, which the plaintiff refused to pay. A warrant for the collection of this tax was afterwards levied upon the plaintiff's property, which was sold and the avails were paid into the town treasury. All the proceedings in making the assessment list, and in laying and levying the tax, were admitted to be regular.

The estate in question is situate on the *East* side of *North* street in the village of *Litchfield*, and contains about thirty-six acres. The original deed, from a committee of the towns of *Hartford, Windsor* and *Farmington,* to the first settlers of the town of *Litchfield,* dated *April* 27th, 1719, granted to them " three home lots, with other divisions of land, to be laid out thereunto, &c. the whole of said three lots to be three sixtieth parts of the whole plantation ; to be, and remain for the uses following, and to no other use and purpose whatsoever, *viz*. one home lot, with the divisions and commons thereto pertaining, to be given and granted to the minister that shall be first ordained in the said plantation, by the choice and approbation of the major part of the inhabitants thereof, to be and remain to him and his heirs forever : one lot, with the divisions and commons, to be and remain to and for the use and improvement of the said first minister, and his successors in the work of the ministry, in the said place : and the other of the said three lots to be and remain forever, to be improved by the inhabitants of the said plantation, to the best advantage, for the support and maintenance of the school for the well educating of the children of the said place." (*a*)    In 1745, under the second clause of

(*a*) In *May*, 1719, the General Assembly, upon the petition of Lieut. *John Marsh*, of *Hartford*, and Deac. *John Buel*, of *Lebanon*, with fifty-five other persons, granted them liberty and full power to settle a town at *Bantum ;* the said town to be divided into sixty rights; *three whereof were to be improved for pious uses* in said town. A patent, dated *May* 19th, 1724, was afterwards granted to these proprietors. *R.*

the foregoing extract, the land in question was surveyed out (as expressed in the record of the survey) "to the ministry." In 1753, the town of *Litchfield*, being one ecclesiastical society, voted to lease this land for 999 years, to the Rev. *Judah Champion*, the clergyman recently settled there, in payment of his settlement; and the land was accordingly so leased, by a committee appointed for that purpose, with covenants of quiet enjoyment. Mr. *Champion* accepted the lease, and held possession of the land under it, from the date thereof to the time of his death, in *October*, 1810. He devised the land to the plaintiff, who immediately went into possession under such devise, and has held possession until this time, claiming title thereto against all other persons. In 1811, the plaintiff voluntarily put the land into his list of taxable property, which was carried into the assessment list of the town; and a tax was laid upon it, which was paid, without objection, by the plaintiff; and every year from 1811 to 1832 inclusive, the plaintiff, in like manner, put the land into his list, on which taxes were annually laid, and paid, by him, without objection.

These facts were admitted to be true; whereupon the case, by consent of the parties, was withdrawn from the jury, and reserved for the advice of this court, upon the question whether this land ought, or ought not, to have been put into the assessment list of the plaintiff, in 1833.

*P. Miner* and *T. Smith*, for the plaintiff, contended, that the estate in question was given "for the maintenance of the ministry of the gospel," within the provisions of the act of 1702, and should be "free from the payment of rates." They cited, as fully supporting this position, the cases of *Osborne* v. *Humphrey*, 7 *Conn. Rep.* 335. *Atwater* v. *Woodbridge*, 6 *Conn. Rep.* 223. and *Parker* v. *Redfield*, 10 *Conn. Rep.* 490. They also urged the following considerations.

1. That the *legal* interest in this land, was in the *town*. There is a plain distinction between the lots mentioned in the first and second clauses of the original deed. The former was to be conveyed to the first minister in fee; but there was to be no transfer of the latter to the incumbent of the pastoral office; as the minister of a parish has never, in this state, been a corporation; and therefore, could not take in succession. It was evidently the intention of the grantors, that the legal interest

should vest in the town, on its being incorporated ; and it must be presumed that it did so vest, after so long an occupation. *Phill. Ev.* 124. *Jackson* d. *Stoughtenburgh* & al. v. *Murray,* 7 *Johns. Rep.* 5. *Vandyck* v. *Van Beuren* & al. 1 *Caines* 34. *England* d. *Syburn* v. *Slade,* 4 *Term Rep.* 682. *Hillary* v. *Walker,* 12 *Ves.* 239. *Huntington* v. *Carpenter, Kirby* 45. *Camp* v. *Camp,* 5 *Conn. Rep.* 291. *Stat.* 439. (*ed.* 1808.)

2. That the *beneficial* interest was in the *town,* or *its inhabitants.* The consideration of the deed of 1719 was " the encouragement of the first settlers in the plantation." The grantors contemplated a benefit to them and their posterity. The object was, to put into their hands a fund to pay their minister ; and not to give the minister a bounty, in addition to a settlement and a full salary.

3. That the estate was unquestionably given *for the maintenance of the gospel ministry.* If the meaning of the clause constituting the charity, be, that the town must use and improve the estate, through their minister, in order to support him, (which is not admitted,) the use is not, on that account, the less public and charitable.

4. That the estate might be leased for 999 years. Actual occupancy by the successive ministers, could not have been contemplated by the grantors. In this case, the town and society have paid their successive ministers a full compensation in cash ; and whatever rights any minister may be supposed to possess under and by virtue of the deed of 1719, have been purchased by them, and vested in the lessee and his devisee, by estoppel. No minister could have any remedy at law or in equity, after having received a full compensation for his services pursuant to agreement at the time of settlement.

5. That if the estate might have been reclaimed, on the death of Mr. *Champion,* it can be still : the possession of the plaintiff is not adverse. 1 *Bla. Com.* 87. *Merwin* v. *Camp,* 3 *Conn. Rep.* 49. per *Bristol,* J. *Galloway* v. *Ogle,* 2 *Binn.* 472. *Camp* v. *Camp* & al. 5 *Binn.* 291. *Bishop* v. *Edwards, Bul. N. P.* 103, 4.

6. That the town is estopped, by their lease, from claiming that the estate is taxable. The town sold the property *with all its privileges,* of which this exemption was one. Can they now affirm that it was taxable, by reason of their own want of power to convey ? There is a double estoppel : first, they can-

not allege their own want of authority; and secondly, they cannot insist, that it is taxable, when they have sold it as being exempt. *Peacock* v. *Harris*, 10 *East* 104. *Merwin* v. *Camp*, 3 *Conn. Rep.* 48, 9. *Com. Dig. tit.* Estoppel. A 2. A 3. *Co. Litt.* 352. *a.*

7. That the user in this case is immaterial. The obligation to pay taxes is not created by grant, but by statute law. The entire subject is matter of statutory regulation. The towns have no power to make contracts on this subject ; and what the legislature has done appears by its acts. Besides, the exemption is created by a contract between the public and the grantors. If the legislature cannot impair the obligation of this contract, by statute, how can it be done by user ?

*L. Church* and *O. S. Seymour*, contra, contended, 1. That the true intent and meaning of the grantors of the land in question was, to dedicate it, to be forever and unalienably kept for the use and improvement of the successive ministers, who should be here settled in the work of the gospel ministry. This intent is distinctly expressed in the deed. The land itself is to be and remain, forever, to and for the use and improvement of the first minister and his successors. If the object had been to vest the land in the *town*, to be by them disposed of for the ministry, the usual limitation would have been adopted ; as in the case of *Osborne* v. *Humphrey*, where the land was conveyed to the town for the use of the ministry. In that case, there was nothing to prohibit alienation. Consistently with the intent of the grantor, the land might there be aliened, and the avails applied at once ; but here there is a clause against anticipation. It was clearly the object of the grantors to provide for *posterity ;* and the wisdom of the provision can now be seen.

2. That such intent is a lawful one ; and the conveyance, construed according to that intent, is valid, by the laws existing at the time of the conveyance ; and the land is protected from alienation, by the statute of 1702.

2. That this conveyance does not authorize nor admit of the lease of the land for 999 years, for a sum in gross. Where the land is given, in general terms, to the use of the ministry, the alienation is consistent with the intent of the grantor : there is nothing to prevent the appropriation *en masse* : and the statute of 1702 requires the estate to *remain forever* so far forth

only as such perpetuity is necessary to carry into effect the true intent and meaning of the grantor. In the case of *Parker* v. *Redfield*, the leases were consistent with the grant; the land being granted generally for the support of the church; but in the case of *Hanchett* v. *King*, 4 *Day* 360. 366., where the words were not as strong as in this case, it seems to be taken for granted, that the land was not alienable.

It is said, that the society support their clergyman, and thus pay an equivalent. But the very object of the grant was, to relieve posterity from this equivalent. A further object was, to make a handsome provision, *throughout all time*, for the minister, by adding the use of this land to what the society might be otherwise willing and able to pay as salary.

4. That the plaintiff, therefore, does not derive a title to this land under or through the conveyance to pious uses; but his claim to title is *adverse* to the title under that conveyance; and his ownership (if he is owner) is by a diversion of the land from the pious use to which it was given.

5. That the exemption from taxation guarantied by the statute of 1702, does not attach to the land itself, but only to the favoured title, and to those who occupy and claim through and under the conveyance to pious uses. The contract of 1702 is between the government and the grantors of the land. The exemption stipulated for, by the grantors, is only so far forth as they have an interest in the exemption. Where the land is sold under the conveyance, the grantors have an interest in the exemption of the alienee, on account of the *enhanced price;* but they have no interest in the exemption of a disseisor, or a person claiming title otherwise than under such conveyance. And it is in accordance with the decision in *Atwater* v. *Woodbridge*, that property given under the statute retains the rights and privileges attached to it, at the time of the grant, only *while it is applied to the uses designated.*

6. That the ground thus far conceded to the plaintiff, that the statute of 1702 is *a contract*, is untenable; that statute being a general law, founded on reasons of public policy existing at the time it was passed, which, like other general laws, was repealable at the pleasure of the General Assembly, and was, in fact and of right, repealed, at the revision in 1821.

BISSELL, J. In this case, the plaintiff claims to recover, on the ground that the taxes assessed upon, and paid by him, were illegally imposed; and two questions are presented for our consideration.

1. Were the lands in question ever exempt from taxation? And if so,

2. Has that exemption been destroyed, or does it cease to exist?

1. Were these lands exempt from taxation within the act of 1702? Or, in other words, were they given or granted "*for the maintenance of the ministry of the gospel,*" within the spirit and meaning of that act?

The answer to this enquiry depends upon a sound construction of the deed from a committee of the towns of *Hartford, Windsor* and *Farmington,* to the grantees therein named, and dated the 27th day of *April,* 1719.

Among other lands conveyed by this instrument, are three homelots, with the divisions and commons thereunto appertaining, containing three sixtieths of the whole, granted for the purposes set forth in the words following, *viz.* "one home lot, with the divisions and commons thereunto pertaining, to be given and granted to the minister that shall be first ordained, in the said plantation, by the choice and approbation of a major part of the inhabitants thereof, to be and remain to him and his heirs forever: *one lot, with the divisions and commons, to be and remain forever, to and for the use and improvement of the first minister, and his successors in the work of the ministry in said place:* and the other of said three lots to be and remain forever, to be improved, by the inhabitants of said plantation, to the best advantage, for the support and maintenance of the school, for the well education of the children in the said place."

The question arises in regard to the second lot mentioned in the above quotation. Was that lot granted for the *maintenance of the ministry of the gospel;* and was such the intention of the grantors? This is the enquiry.

It should be here remarked, that one object of the grantors was the encouragement of the first settlers of the plantation, as it is called. This is fully expressed, on the face of the instrument; and is, indeed, mentioned as one part of the consideration for the conveyance. And such were the views and feel-

*Litchfield,*
*June, 1836.*

Landon
*v.*
Litchfield.

ings of the men of that day, that nothing could more effectually encourage them, to settle down in a wilderness, than a permanent provision for the maintenance of the gospel ministry, and the support of schools for the education of their children and youth. These were always leading objects with the Fathers of *New-England.* Both these objects, we think, were contemplated and provided for, in the grant now under consideration ; and the *one* as clearly as the other.

It was, in the first place, as it seems to a majority of the court, manifestly the intention of the grantors, to make a permanent provision for the maintenance of the gospel ministry. And this intention is, we think, equally clear, whether we look only at the phraseology adopted, in granting the lot in question, or whether we take this clause in connection with the other parts of the instrument.

This lot is *to be and remain for the use and improvement of the first minister, and to his successors in the work of the ministry.* But one of two constructions, can be put upon this language. The grantors either intended, that the benefits of this grant should be personal to the minister, and, as has been contended at the bar, that the lot conveyed should constitute a sort of glebe, for the personal accommodation of the clergyman, for the time being ; or they intended the grant to enure to the benefit of the inhabitants of the plantation, by enabling them, the more easily to sustain the preaching of the gospel. We suppose, that the benefit of the grant was intended for those upon whom the support of the ministry would devolve ; and that such is the fair import of the language employed. Had the grant been for the *maintenance* of the ministry, or of the first minister and his successors, there could have been no doubt. And is not the language of the grant equivalent to that ? Can it be for a moment supposed, to have been the intention of the grantors, that the minister for the time being, should be in the personal occupancy of this lot ? That he should strictly use and improve it, and that his failure to do so should induce a forfeiture of the grant ? It has been truly said, "that there is no magic in words." And it will be readily admitted, that no particular form of expression is necessary to bring a case within the provisions of the act of 1702, provided that the intention of the grantor can be clearly ascertained. In *Parker* v. *Redfield,* 10 *Conn. Rep.* 495. the grant was " for the support and main-

*Litchfield,*
June, 1836.

Landon
*v.*
Litchfield.

tenance of the church." It was held, that this grant was within the act. And to hold, that the grant in question is not within it, would, it seems to us, be doing violence to the intention, as well as to the language, of the grantors.

Again, if we view this clause in the deed in connection with other parts of the instrument, we arrive at the same conclusion.

It has already been remarked, that one object of the grantors, was, the encouragement of the first settlers. This they explicitly state; and they state it as a motive for the grant in question, and also for that for the support of a school. And do they not stand on precisely the same ground? Can any well founded distinction be taken between them? Both lots are *to be and remain*, for the purposes stated in the deed. And can we say, that a benefit was intended to the settlers in the one case, and not in the other? Can the conclusion be avoided, that the one lot was as fully intended for the support of the ministry, as that the other was intended for the support of a school?

Again, one lot was to be given and granted to the minister who should first be ordained, to be to him and his heirs forever. This was for the personal benefit of the first minister, and was, undoubtedly, intended as an inducement to his settlement.

It has indeed been urged, that there is no distinction, in principle, between the grant of this lot, and that of the one we have been considering; that both stand on the same ground; that if the one was granted for the maintenance of the ministry of the gospel, so also was the other; and if one be exempt from taxation, so also is the other.

Even if these positions were tenable, it is difficult to see how they affect the construction of the grant, upon which this case turns. But they are not tenable. These lots were granted, not for the same, but for very different purposes. The one, we have endeavoured to show, was intended for the benefit of those who were to support the ministry; the other for the benefit of the first minister and his heirs. It was neither given nor granted for the "*maintenance of the ministry of the gospel.*" Suppose a minister had been already settled, and the conveyance had been directly to him and his heirs; could there be any pretence for claiming, that the grant would have been within the provisions of the act of 1702? Surely not. And does it make any difference, that inasmuch as a minister was not then settled, a trust was necessarily interposed? The mo-

*Litchfield,*
*June, 1836.*

Landon
*v.*
Litchfield.

ment a minister was ordained, according to the terms of the grant, the trust ceased. His title to this lot became perfect, and he might immediately have enforced a conveyance in chancery. And had he died, or been dismissed, the next day, the title would have been unaffected. It is surely unnecessary to pursue this idea further.

Upon the best consideration, then, which we have been able to bestow upon the construction of this grant, we are of opinion, that the lot in question was granted for the maintenance of the ministry of the gospel, within the meaning of the act of 1702, and was, therefore, exempt from taxation.

We are, therefore, brought to enquire,

2. Whether this exemption has been destroyed ? That it has been destroyed, is contended on two grounds : first, by an act of the legislature ; and secondly, by the acts of the grantees, or those claiming under them.

It is said, that the statute of 1702 was virtually repealed, by the act of 1821 ; and that by the express provisions of that act, this property is subject to taxation.

There has been such an uniform and repeated expression of opinion on this precise point, that it *ought* to be considered as at rest. In *Parker* v. *Redfield*, 10 *Conn. Rep.* 495., the court say : " This point has been so recently and so fully explained, in the cases of *Atwater* v. *Woodbridge*, and in *Osborne* v· *Humphrey*, that it ought not again to be drawn into discussion." In view of these repeated adjudications, the mind is at a loss to conceive what object is proposed, by again agitating this question. Is it, that decisions are to be regarded as of no binding authority ? That nothing is to be considered as settled ? And that the maxim " *stare decisis,*" has become too antiquated and time-worn for modern application ? We do think it of some importance, that uniformity of decision should be preserved ; and that the profession, at least, should be able to determine, with some degree of accuracy, what is the law, upon a given point.

Is this exemption destroyed, by the acts of the grantees themselves, or of those claiming under them ?

It is contended, that by the lease to the Rev. Mr. *Champion,* for 999 years, in consideration of his settlement, this lot was diverted from the use to which it was intended, and *thereupon* became subject to taxation.

Unless we are entirely mistaken in the view we have taken of the case of *Osborne* v. *Humphrey*, and entirely misapprehend the grounds of the decision, this precise point was there made and determined. We are unable to distinguish the cases.

In that case, lands were granted for the support of the ministry of the gospel. If the views already taken of this case are correct, they were here so granted. There was a lease for 999 years, in consideration of a gross sum, paid. It is so here. These are the leading facts, in both cases. *There,* one ground of defence insisted upon, was, that the lands *were* so leased. That defence was overruled. The same ground of defence is insisted upon here. Can we say, without directly overruling that case, that it ought here to prevail? It is, indeed, said, that there, the *consideration* of the lease came in lieu of the land, and was applied to the same object for which the land was granted; whereas here, the consideration was the settlement of Mr. *Champion ;* and that nothing was, in point of fact, received; and that in this respect, the cases are distinguishable.

To this claim, it may be answered, in the first place, that it takes for granted the existence of a fact in *Osborne* v. *Humphrey*, which no where appears in the case. It does not appear to what purpose the sum received as the consideration of the lease, was appropriated. That circumstance is not adverted to, in the opinion given in the case. The decision proceeded upon no such ground : it could have proceeded upon no such. For, upon the principle here assumed, as the correct one, the fund, which came in lieu of the land, would have been exempt from, while the land itself would have been subject to, taxation. And that is said to have been the ground of the decision in *Atwater* v. *Woodbridge*.

It is said, that the fund, in that case, consisted, in part, of the avails of land, which had been granted for the support of the ministry, and sold ;—that the court held the fund so raised, to be exempt from taxation ; and therefore, must have held, that the land was liable to be taxed.

Here, also, a fact is assumed, which does not appear in the case. It does not appear, that any portion of the fund claimed to be exempted, arose from the sale of lands so granted. It does appear, that a fund was established, consisting partly in lands,

and partly in money, either given or granted. But that any portion of the lands granted, had been sold and converted into money, no where appears. The case of *Osborne* v. *Humphrey*, certainly, did not profess to overrule, but to be founded upon, that of *Atwater* v. *Woodbridge*. Let us then, for a moment, compare the respective claims, founded on these decisions, and see how they coalesce, and how far the one is supported by the other.

In *Atwater* v. *Woodbridge*, it is said, the fund arose from the sale of lands, which had been granted for the support of the ministry. The court decided, that the fund was *exempt from*, and therefore must have held, that the land so granted and conveyed, was *subject to*, taxation. In the case of *Osborne* v. *Humphrey*, the land granted for the support of the gospel, was leased for 999 years ; and the consideration money was appropriated to the same object ; and *therefore*, the court held the land to be *exempt* from taxation.

It is impossible to reconcile the two cases upon the principle claimed ; and it is equally impossible, as we think, to look into the case of *Osborne* v. *Humphrey*, and not to perceive, that the decision is rested on other, and very different grounds. It is based upon the broad principle, that the privilege of exemption attached to the *land*, and not to the *favoured title*, as it has been termed. It adopted the reasoning, as well as the language, of the Supreme Court of the *United States*, in the case of *New-Jersey* v. *Wilson*, 7 *Cranch* 164. It placed the grant on the ground of a contract between the government and the grantor, that the land so given or granted, should remain exempt from taxation. Whether this principle be correct, and whether that decision be right or wrong, is not now the question.

We have, indeed, said, on a former occasion, that the principle of that case is not to be extended ; but neither did we profess to overrule it. We regarded it as an authority, by which we were bound. We yielded to it. If our steps are to be retraced, and that case is to be overruled, let it be done directly and unhesitatingly, instead of frittering away the principle of the decision, by resorting to circumstances which do not affect it.

The title of the plaintiff has been called in question.

The objections to it, if they are rightly understood, rest on

two grounds :—first, that the town of *Litchfield*, (then embracing only one ecclesiastical society,) had not the legal title, and therefore, had no power to make the lease ;—and secondly, that the plaintiff does not claim *under* or *through* the original grant, but that his title is *adverse* to the title under this conveyance.

In regard to the first objection, it might, perhaps, be well questioned, whether the town of *Litchfield* is not estopped from urging it, by the covenants in the lease. But be this as it may, it is very clear, that a trust was created, in regard to this lot, by the original grant ;—and that the grantees named therein were the trustees for the time being ; and it is equally clear, that the grantors contemplated the future incorporation of a town ;—and that the town, when incorporated, was intended to be the party beneficially interested in the grant ;—and of course, to become the trustees of this property. And in regard to the second objection, it is only necessary to say, that it is involved in that which has been already considered.

It has been further urged, that the plaintiff has paid taxes on this lot for twenty years ; and therefore, he cannot now claim the exemption. This objection has not been much insisted upon ; and it is certainly not easy to discover on what principle it rests. We know of no rule of presumption applicable to a case like this. The exemption is claimed under a public law of the land ; and that, as we have held, remains on the statute book, unrepealed. What possible room is there for a presumption of any kind ?

We are, therefore, of opinion, that upon the case stated, the land in question is exempt from taxation ; and advise the superior court, that the plaintiff is entitled to recover.

WILLIAMS, Ch. J., and WAITE, J., were of the same opinion.

CHURCH, J. From the most attentive consideration I have been able to bestow upon the most important questions suggested by this case, I have been led to a conclusion opposed to the opinions expressed by my brethren.

The claim of exemption from taxation, which the plaintiff makes in behalf of his lands, is founded exclusively upon the statute of 1702, by which it was enacted, " That all such lands,

tenements, hereditaments and other estates, that either former-ly have been, or hereafter shall be, given and granted, either by the General Assembly of this colony, or by any town, village or particular person or persons, for the maintenance of the ministry of the gospel, in any part of this colony, or schools of learning, or for the relief of poor people, or for any other public and charitable use, *shall forever remain* and be continued to the use or uses to which such lands, tenements, hereditaments or other estates have been, or shall be, given and granted, according to the true intent and meaning of the grantors, *and to no other use whatsoever ;* and shall also be exempted out of the general lists of estates and free from payment of rates."

In almost all the towns in this state, lands were very early granted or sequestered, for some of the purposes or uses designated in this act. Many of these lands, and particularly such as were intended for the maintenance of the ministry, were located, as the plaintiff's lands are, in the most central parts of the several towns, and were intended to be, as they have in truth become, the best located and most valuable lands, and in many instances, covered with expensive buildings. Some of these lands still remain devoted to their original and pious uses, while, it is believed, that most of them have been, either by fee-simple deeds, or by leases for nine hundred and ninety-nine years, held and conveyed to purchasers, who hold and improve them, divested of their original uses, and who transmit them unincumbered to others.

The lands in question, as the plaintiff claims, were granted by the towns of *Hartford,* *Windsor,* and *Farmington,* to certain trustees, for the maintenance of the ministry of the gospel in the town of *Litchfield.* The town of *Litchfield,* afterwards, by a lease for nine hundred and ninety-nine years, without reserving any rent or other charge, conveyed them to the Rev. *Judah Champion,* a minister of the gospel, in consideration of his settlement there in the work of the gospel ministry. Mr. *Champion* occupied them, during his ministry, and life, and at his death, he devised them, discharged of their original use, to the plaintiff. The plaintiff is not a minister of the gospel ; and these lands have never been, in any wise used, occupied or improved, by him, for the support of the ministry ; but are devoted to the plaintiff's exclusive private benefit. And it is agreed in the case, that since the death and ministry of Mr.

*Litchfield,*
June, 1836.

Landon
*v.*
Litchfield.

*Champion,* a period of more than twenty years, the plaintiff has, annually and voluntarily, set down these lands in his list of taxable estate, and paid taxes upon them, without claim of exemption, until the occasion which has produced the present controversy.

By a statute passed in 1821, it was enacted, that "Lands and dwelling-houses, with the appurtenances thereof, which have heretofore been granted or sequestered for the use of schools, or other public or pious uses, and which have been leased or let for terms of time not yet expired, at rents merely nominal, shall be valued and assessed at such rate and proportion, as regarding the duration of the lease, the rent now actually *paid and applied* to such public uses, bears to the whole actual value, according to the rules applicable in other cases, as prescribed in this act, and shall be set in the list at 3 *per cent.* of such value." The defendants claim, under the circumstances of this case, that since the death of Mr. *Champion,* the statute of 1702 has had no operation upon this land; and that if it ever had, such operation ceased, when the statute of 1821 was enacted, by which the former statute was in effect repealed.

But the plaintiff insists, that the statute of 1821, so far as it operates upon lands before that time exempted from taxation, by the statute of 1702, is unconstitutional and void, as being a law impairing the obligation of contracts, within the meaning of the constitution of the *United States.* And whether it be so, is the first question presented. To pronounce a legislative act to be unconstitutional and void, is clearly within the well established powers of the judiciary department, and among its duties too, in cases clear and obvious. But such a power will never be rashly exercised. The legislature is subject to the same constitutional restraint as the courts, bound by the same oaths, impelled by the same sense of duty to regard the constitution as fundamentally obligatory. The enactment of a law, therefore, furnishes *prima facie* evidence of its constitutionality, not to be slightly regarded; nor will such evidence be overturned, by an immatured judicial opinion.

In ordinary cases, the evils resulting from a mistaken opinion of the judiciary, have a remedy in the action of the legislature; but in cases involving the constitutional validity of laws, no such remedy exists. And courts, which shall carefully re-

view former decisions impeaching the constitutionality of statute laws, cannot justly be charged with disrespect to the authority of judicial precedent.

The statute of 1702 was a public law, an act of general legislation. Its objects and purposes were exclusively of a public nature; the diffusion of learning and piety among the entire people. It had regard to no individual, nor corporation, nor class of men, as distinguished from the whole community. The question is, is such a law a *contract,* within the plain and clear intent of the constitution, so as to be beyond the future controul of the same power which granted it? I think it is not.

There is a distinction between a contract and a law. "A law," says *Blackstone,* "is called a *rule,* to distinguish it from a compact or agreement." 1 *Bla. Com.* 45.

In this state, we have had statutes created for the same general purposes as the one under consideration; such as the laws exempting all the estates of ministers of the gospel from taxation, as well as laws exempting such ministers from capitation or poll tax. Now, I can perceive nothing in these laws, nor in the statute of 1702, which assimilates them, in any one respect, to contracts, either executed or executory. There are no more parties here than are visible in any other general law in the statute book; no consideration; nothing done, nor agreed to be done, or left undone, as distinguished from the statutory provisions of most other laws. I know it is said, that here is a promise, on the part of the state, to all who shall grant lands for the use specified in the statute, that they shall be exempted from taxation forever. There is just as much a promise of this character, as in the other laws referred to, that all who shall become ministers of the gospel, shall be exempted from both property and poll tax; or, as may be seen in another statute, which exempts from a poll tax, all such militia officers and privates, who shall perform military duty, and be equipped and dressed in military uniform.

It seems to me, in all these cases, as well as in regard to most, if not all, general laws, that the only engagement, on the part of the public, is, that the law, while it exists, shall be faithfully observed, and carried into effect, by the executive and judicial authorities; and that nothing which has been done under

*Litchfield*,
June, 1836.

Landon
*v.*
Litchfield.

the law and upon its faith, shall become void or unlawful, by its repeal.

If it was claimed here, that a repeal of the statute of 1702 divested the titles, or divested the use of the lands granted under it, such a claim could not be sustained : a repeal could have no such effect. There are many cases in which a general law may impair the obligation of a contract incidentally, and yet would not be adjudged void ; as in contracts of affreightment, and other contracts, which are frequently affected, by laws imposing embargoes and other regulations, which state policy may require. And so, if a covenant be made for the performance of a lawful act, and before the time of performance, a statute renders the performance of such act unlawful, &c.

Did the legislature, by which the statute of 1702 was enacted, suppose they were thereby entering into a contract on behalf of the state, with any body ? That they did not, is not only inferable from the purpose intended by that act, but also from a statute, in some of its parts similar, passed in 1737, and continued until the revision of 1821, by which the polls and estates of ministers of the gospel were exempted from taxation, and by which also, and in the same section, it was enacted, as in the statute of 1702, that all lands and buildings sequestered to, and improved for schools, and other public or pious uses, should be exempted from being put into the lists of taxable estate. The first of these provisions, regarding the exemption of the polls and estates of gospel ministers, was never claimed as constituting a contract, and has been repealed, without suggesting a doubt of the constitutionality of such repeal. If the statute of 1702 is in the nature of a contract, so is the last provision of the section of the act referred to ; for they are essentially the same ; but it cannot well be presumed, I think, that one part of the same section of this law is subject to modification and repeal, and the other, without any corroborating intimation, is to be construed as in the nature of a contract, and beyond the controul of all future legislation.

Upon the whole, the question seems to be, if person or property, by general law and for public purposes, be exempted from taxation, to promote the general good, whether the same may again be made subject to public burdens, whenever the same public good requires it ? Upon principle, I am persuaded it may, until at least such general law shall disclose so much of a

contract, as that its parties, consideration and subject matter may be discovered. And I think, with the supreme court of the *United States,* in the case of *Fletcher* v. *Peck,* 6 *Cranch* 87. that "so far as it respects general legislation, one legislature cannot abridge the powers of a subsequent one; but if an act be done under a law, a succeeding legislature cannot undo it." And if there be a case, either in this country or elsewhere, sanctioning a different doctrine, unless perhaps it may be the case of *Osborne* v. *Humphrey,* 7 *Conn. Rep.* 336. it has eluded my research. But as my brethren believe themselves controuled by authority, in the decision of this case, I will briefly review the most prominent cases on this subject.

The first case in which the question was agitated, how far one act of the legislature was to be considered as a contract within the proper construction of the constitution of the *United States,* was *Fletcher* v. *Peck,* 6 *Cranch* 87. The state of *Georgia,* by its legislature, had empowered and directed the Governor, for an ample consideration received, and secured, to grant certain vacant lands belonging to the state, to an association of individuals, called the *Georgia Company.* The Governor complied with the direction, and issued the necessary grants or patents for that purpose. A subsequent legislature repealed the act under which the lands were sold; ordered the record of it to be burned; and declared the grant made by the Governor, to be void. These proceedings were adjudged void, as impairing the obligation of a contract. But the facts of that case have no analogy to the present. There was a perfect executed contract, made between known parties, and for a valuable consideration paid and received. The lands of the state had been sold, by a grant legally executed; and the grantor then, without the assent of the grantee, attempted to revoke it. Such an act would have been illegal, upon common law principles alone. Here was no act of general legislation, but a mere matter of bargain between the state on the one part, and private individuals on the other.

The next case is that of *New-Jersey* v. *Wilson,* 7 *Cranch* 174. decided soon after. The facts which gave rise to that case, were, that commissioners had been appointed, by the state, or at that time colony, of *New-Jersey,* to treat with certain *Indians,* who had claims upon lands in that colony. A treaty, or contract was made, by which the *Indians,* on the one part,

agreed to relinquish their claims upon the lands, and in consideration thereof, were to receive other lands from the colony, on the other part, which were to be forever exempt from taxation. The legislature, by an act, carried this bargain into effect, conveyed other lands to the *Indians*, and declared them exempt from taxation. But it is to be here recollected, that the use of these lands was not restricted, nor the purposes to which they should be appropriated, declared: the privilege was attached to the lands themselves, however they might thereafter be disposed of. Subsequently, these lands were sold by the *Indians*, and were then attempted to be made subject to taxation; but the supreme court of the *United States* decided, that they could not be thus subjected, without a violation of the constitution. Here again, is to be seen a contract, in all its essential requisites, ratified and carried into full effect, by legislative enactment.

There is another class of cases, and although assuming a different form, embracing cases of essentially the same character. I allude to charters of incorporation. These are the result of private legislation; they are grants of franchises, and as such, are executed contracts, as much so, as grants of any other description, or patents under the great seal of the state. They are unrepealable, not because they are laws, but because they are contracts.

It is unnecessary to refer particularly to the other cases in the national courts, wherein the question now under discussion has arisen; it is enough to say, that by none of them has the doctrine connected with this question been extended further, than as recognised in the cases already referred to.

In our own courts, the first case in which the statutes of 1702 and 1821 came under judicial notice, was the case of *Atwater* v. *Woodbridge*, 6 *Conn. Rep.* 223. But in that case, the question of the constitutionality of the repealing act of 1821, was not involved. There, the only matter of doubt was, whether a *monied fund*, bearing interest, and created for the support of the ministry, was liable to be taxed under the law subjecting moneys at interest to taxation. The court, very correctly, held, that such a fund was *an estate*, within the meaning of the act of 1702, and as such, was exempt from taxation; and that the statute subjecting *money at interest* to taxation, did not, and was not intended to interfere with the statute of 1702.

The judge who declared the opinion of the court, in that case, to be sure, says : " I cannot, for a moment, believe, that the legislature ever intended to interfere with the rights given and acquired under the first statute ; *but if they did,* I will, with deference, but with boldness, say, they had no constitutional power to effect it." This latter opinion was entirely extra-judicial, and so believed to be, by the judge whose opinion it was. I cannot consent, that such an opinion, given in such a case, shall become a precedent too strong for the resistance of both the court and the legislature. Indeed, hypothetical opinions are never considered as authoritative, even in ordinary cases, and much less should they become so on constitutional questions.

But reference has been made to the case of *Parker* v. *Redfield,* 10 *Conn. Rep.* 490. as an authority upon this point. No such question as this case presents, was involved in that. The question there was, whether *buildings* erected upon lands which were exempted from taxation, under the circumstances of that case, were as well exempted from taxation as the land upon which they stood.

The case of *Osborne* v. *Humphrey,* 7 *Conn. Rep.* 336. is one supposed by the plaintiff, to be decisive of the present. It is very true, that the facts in that case are nearly similar to the facts in this, and the decision there, recognised the validity of the plaintiff's claim here. That case was not decided by a full court : three judges only, heard and determined it. The court do not go at all into a discussion of the principles upon which they rely ; but seem to depend entirely upon what they consider as the authority of decided cases. These cases, and the only ones referred to, are *Atwater* v. *Woodbridge*, and *New-Jersey* v. *Wilson.* These cases I have already considered ; and I am entirely mistaken in my understanding of them, if either of them furnishes a precedent, or decides a principle, supporting the decision in the case of *Osborne* v. *Humphrey.* I feel myself, therefore, constrained, by principle, and, as I think, unfettered by precedent, to believe, that the statute of 1821, subjecting to taxation lands situated as the plaintiff's are, is constitutional.

2. But conceding that the statute of 1702 is in the nature of a contract, and that the statute of 1821 is unconstitutional ; does the plaintiff show, that his lands are *now* exempt from tax-

ation, even under the former act ? I think he does not ; and that he cannot do so, unless he can successfully insist upon a performance of the supposed contract on the part of the state, after he has refused a compliance with it, on his own part.

The statute of 1702 required, that such lands, as by it were to be exempted from taxation, should " forever remain and be continued to the use or uses to which they had been given and granted, according to the true intent and meaning of the grantors, and to no other use whatsoever." According to the claim of the plaintiff, this important provision is to have no operation, but is to be entirely disregarded in the construction of the law. I cannot yield to this consequence. The object of the legislature, unquestionably, was, either to render lands which had been sequestered to public or pious uses, inalienable ; or to limit the exemption or privilege attached to them to the public or pious use to which they were actually appropriated ; and that while such lands were contributing to the furtherance of public or pious objects, they should be exempted from the further and additional burden of taxation. In either case, upon the facts here disclosed, this plaintiff can claim no benefit of the contract, and is not entitled to the exemption he claims.

If this land was inalienable, and was to remain forever to the use of Rev. Mr. *Champion*, and his successors in the ministry, then Mr. *Champion* could not devise it to the plaintiff ; and the plaintiff derived no title, by virtue of Mr. *Champion's* devise. *Landon* entered upon it in his own wrong, and as a disseisor ; and if now, by length of time, he has acquired a title, it is not a title under the original grantees or trustees, and to which only the privilege of exemption attached, but adverse to it. I cannot comprehend how the plaintiff, if he claims by adverse occupancy, and in hostility to the title sanctioned by the statute of 1702, can claim any of the privileges conferred by that law.

But here it is said, that as the town of *Litchfield* conveyed this land to Mr. *Champion* for 999 years, and which, in fact, if not in form, is equivalent to a freehold of the most valuable description, they are now estopped to deny his right to devise to *Landon*. But it is to be remembered, that the question now is, not whether *Landon* can hold this land, by virtue of this devise, as against the town ; but whether by the laws of the state, it is exempt from taxation ? If the state, or any other commu-

nity, who are not estopped, can levy and collect taxes upon this land, so can the town of *Litchfield.* And if the town cannot tax it, neither can the state or county. The assessment list of each town is the only rule of taxation for communities. *Stat.* 527.

But whether the plaintiff holds this land under the original title of the trustees to whom it was originally conveyed, or by any other title, I hold it to be incontrovertible from the obvious reading of the statute of 1702, and the intent of the legislature, by which it was enacted, that if he does not hold it for the support of the ministry, he does not hold it exempt from taxation. And such I understand to be the construction given to this statute, by this court, in the aforesaid case of *Atwater* v. *Woodbridge*, on which the judge, by whom the opinion of the court is pronounced, says : " It appears to me, that property given under the statute, *so long as it is applied* to the uses designated, must forever retain the rights and privileges attached to it, at the time of the grant." This opinion was neither extra-judicial nor *obiter ;* it was founded upon the most material circumstance in the case, *viz.* that the interest of the fund established for the support of the ministry, had been invariably appropriated to this purpose, and to no other.

But here, again, comes in the case of *Osborne* v. *Humphrey*, by which it is said, this principle is denied. Of this case, I can only say now, as I have said before, that in regard to this question, it is not supported by either of the cases upon which it seems entirely to depend. The case of *Atwater* v. *Woodbridge* is one of them ; and so far from giving countenance to the case of *Osborne* v. *Humphrey*, it expressly recognises the principle for which I contend. The other case is *New-Jersey* v. *Wilson ;* and it has before been said, that the exemption from taxation of the land there, was attached to the land itself, without any reference to the use to which it might be appropriated, or the purpose for which it was designed. And this fact constitutes a fundamental and controuling distinction between that case and the one for which it is claimed as an authority.

I think distinctions between the present case and that of *Osborne* v. *Humphrey*, may very plausibly be made; but I will not advert to them, because I believe, with my brethren, that it is much better to withstand the authority of that case, by direct opposition. And I enter my humble protest against it,

as being dangerous in principle; and because also, it has wrought up, as I think, an extra-judicial *dictum* found in the case of *Atwater* v. *Woodbridge,* to become a law so stubborn and unchangeable, as forever to controul, not only the courts, but the legislature, and, so far as I can see, even a convention of the people themselves.

3. If these lands, when they came into the possession of the plaintiff, were, for the reasons he gives, exempted from taxation, I am not satisfied, by any thing I have yet heard, that this privilege has not since been abandoned and lost.

If the statute of 1702 can be regarded in any sense as in the nature of a contract, to which the plaintiff, or any body under whom he claims, were ever parties, it seems to me, it must be because it has created a franchise, or conferred some privilege in the nature of a franchise, upon the owners or occupants of this land ;—at least, it is a contract made for their benefit, so far as the exemption is to be regarded, and which they can, of course, waive or abandon at pleasure.

A franchise is sometimes an immunity from tribute, when it is either personal or real, that is, belonging to a person immediately, or by means or reason of any particular place. A franchise royal is said to be where the King grants to one and his heirs, that they shall be quit of toll, &c. *Cromp. Jurisd.* 141. *Brac. lib.* 2. *c.* 5. 10 *Petersd. Abr.* 77.

All franchises may be lost, by non-user or neglect. *Rex* v. *John Monk* and *Rex* v. *Thomas Amory,* 2 *Term Rep.* 215. *Terrett* & al. v. *Taylor,* 9 *Cranch* 43.

Courts have never been partial to the revival of stale and neglected claims ; and therefore, easements, as well as all other incorporeal rights, are presumed either to have been released, for valuable consideration, or abandoned as useless, by non-user and non-claim. *Lawrence* v. *Obee,* 3 *Camp.* 514. *Moore* v. *Rawson,* 2 *Barn. & Ald.* 791. (10 *Serg. & Lowb.* 99.) *Matthews* on *Presump. Ev.* 322. I see nothing to distinguish this claim of privilege, on the part of the plaintiff, from other cases of a kindred character. In the present case, it is admitted, that ever since the death of Rev. Mr. *Champion,* in 1810, until the year 1832, the town of *Litchfield* has claimed and exercised the right of levying taxes upon this land ; and that the plaintiff, during all that time, has waived his pretended right, by voluntarily putting this land into his annual lists

of taxable estate.   For the plaintiff now, after this long acquiescence in the claim of the town, to attempt to revive a long dormant privilege, is to work a fraud upon the town, which has voted its taxes in reference to the supposed amount of taxable estate within it.

It was claimed, I know, that the contract created by the statute, was a contract between the state, on the one part, and the original grantees of this land, on the other, which *Landon* could not waive, being no party to it.   I think this view of the matter is erroneous.   If there was here any thing in the nature of a contract, of which the grantors had right to claim fulfilment, it was only that the lands granted, should remain inviolably to the use to which they were granted ; but the exemption from taxation was a privilege solely conferred upon the grantee, and those claiming under him ;—a privilege which they only could enforce, and which, by one of them, is now attempted to be vindicated.

It is said, also, that *Landon* is not concluded, by his long acquiescence in the claim of the town, because his rights are created by the laws of the state, by a general statute law.   I am not sure that this argument will not prove, if it be legitimate, that rights and privileges can never be lost, by non-user ; for all such rights, if they be indeed rights, are either conferred by the law, or recognised and sanctioned by it.   But I am entirely sure, that this argument is in direct hostility to the whole of the plaintiff's claim, as urged both by court and counsel ; which is, that the right of the plaintiff was created, and exists, by *contract, which no law can impair.*

The reasons thus suggested, which have induced me to dissent from the highly respected opinions of my brethren, are probably mistaken ones : but as yet I cannot discover them to be so ; and I must, therefore, advise, that judgment be rendered for the defendants.


HUNTINGTON, J. being the owner of real estate in the town of *Litchfield,* declined giving any opinion.

Judgment for plaintiff.