FIRST ECCLESIASTICAL SOCIETY OF HARTFORD *vs.* TOWN OF HARTFORD.

By the revised statutes of 1821 all property thereafter conveyed to public and pious uses is subjected to taxation.

Property conveyed to such uses before 1821 may be taxed if the legislature chooses to subject it to taxation. But such property is left by the acts of 1821 under the protection of the statute of 1702, as long as it is faithfully appropriated to its designated use.

The statutes now in force do not subject to taxation lands which prior to 1821 were given or granted for the maintenance of the gospel, and which are now devoted to that use.

A tax illegally assessed in part is illegal *in toto*, and the whole sum paid for such tax, if paid under duress, may be recovered.

ASSUMPSIT, brought before a justice of the peace, and appealed by the defendant to the Court of Common Pleas for Hartford county. The Court of Common Pleas (*Briscoe, J.*) found the following facts, and thereupon reserved the question what judgment ought to be rendered for the advice of this court.

This action is brought to recover of the defendant a sum collected of the plaintiff in the year 1870, by a compulsory process, as taxes on the list of the town of Hartford for the year 1868, together with the costs of collection, and penalties for delay in payment after due, and interest on the sum paid.

The taxes were levied upon two stores in the city of Hartford belonging to the plaintiff, and adjoining each other, both of which were deeded to the plaintiff on the 25th of March, 1831, one having been purchased of Nathaniel Terry and his wife for $4,000, and the other of Daniel Wadsworth for $3,700. The deeds conveying the stores to the society were warranty deeds in the usual form. The two stores were separated only by a party wall, and shortly after their purchase by the society were entirely remodeled in the upper part, and the outer walls raised to make a lecture room, the party wall being removed above the first story, and the upper room has been ever since used exclusively for religious purposes, and it has not been claimed by the town that the portion so used is taxable. The taxes in question were assessed upon the stores below the lecture-room, they being set in the list as "two stores," and valued by the assessors at $9,000, no separate valuation being put upon either store.

On and previous to December 6th, 1802, and while the act of 1702 was in force, which exempted from taxation lands granted for religious and charitable uses, the society had a fund amounting to $2,750, which accrued principally from ancient donations. On the 6th of December, 1802, Jeremiah Wadsworth and others entered into a subscription of the following tenor: "We the subscribers, desirous of increasing and rendering permanent the funds belonging to the First Ecclesiastical Society of Hartford, do promise to pay, or secure to be paid, to the treasurer of the society the several sums affixed to our respective names, for that purpose, and on these conditions: first, the sum of $1,500 at least to be raised by gratuitous subscriptions, and added to the present society fund; second, the fund, principal and interest as it accrues, to be placed from time to time on loan, without any part being expended till it amounts to $7,000, that sum afterwards to be kept entire as a society fund, the interest thereof appropriated and applied for the support of the ministry in the society; third, the society to pass a vote declaring their assent to the above

plan, and also to obtain a legislative act to secure and perpetuate the aforesaid fund according to the above terms." The amount subscribed to this instrument was $4,614, and the society on the 10th of December, 1802, accepted the sums subscribed, on the plan, terms and conditions proposed, and petitioned the General Assembly at its May session, 1803, " to secure and perpetuate the fund according to the terms and conditions specified in said subscription." The General Assembly at said session, pursuant to the petition, passed the following resolution, with a preamble reciting the foregoing facts : " Resolved by this Assembly, that the aforesaid fund, consisting as well of that which belonged to said society previous to the 6th day of December, A. D. 1802, as of the additions thereto made by subscriptions in manner aforesaid, be kept entire as a society fund, the interest thereof to be appropriated for the support of the gospel ministry in said society, and that the aforesaid fund be a perpetual fund according to the true intent and meaning of the aforesaid subscription, and the said votes of said society." The whole amount of the fund, derived principally from the ancient donations, and also from the subscription of December 6th, 1802, was $7,364.

In the year 1823 the society subscribed for fifty-eight shares of the stock of the Phœnix Bank of Hartford, at the rate of $100 per share, in accordance with an act to incorporate the Phœnix Bank, passed May session, 1814, which shares were not transferable, but might be withdrawn by the society at any time, and the money paid therefor refunded. And the society afterwards purchased four shares of the transferable stock of the bank, making in all sixty-two shares, for which the society paid about $6,200 from the fund of the society, and the stock was owned and held by the society until after the purchase of the stores, when the non-transferable stock was withdrawn by the society, and the sum of $5,800 was repaid for the same by the bank, and the four shares of stock were sold by the society for the sum of $412, the withdrawal and sale being made for the purpose of making payment for the stores.

On the 23d of March, 1831, the society passed a vote authorizing a committee, called the building committee, to purchase said property of Messrs. Wadsworth and Terry, and to appropriate the fund of the society toward the payment for it.

The following statement and report, being the first report made by the building committee, shows the manner in which payment was made in full for the store purchased of Nathaniel Terry and wife, and in part for that purchased of Daniel Wadsworth:

"The committee appointed to purchase of Messrs. Daniel Wadsworth and Nathaniel Terry for the First Ecclesiastical Society in the town of Hartford; the building and land next north their church, have collected and received of Phœnix Bank and subscription—

| | | |
|---|---|---|
| Nathaniel Terry's subscription, - - - | $100.00 |
| Of Phœnix Bank for 58 shares privilege stock, | 5,800.00 |
| " " " for 4 shares, transferable, | 412.00 |
| " " " for interest on 58 shares, - | 22.59 |
| Of James M. Bunce, subscription, - - | 10.00 |
| | $6,344.59 |

| | | |
|---|---|---|
| Cash paid N. Terry for his deed, - - | $4,000.00 |
| " " D. Wadsworth in part for his deed, | 2,324.00 |
| " " for recording 2 deeds, - - | .34 |
| " " for carting a cask of nails, - | .12½ |
| " " to N. Johnson to balance, - | 20.12½ |
| | $6,344.59." |

For the balance due to Daniel Wadsworth after payment made to him as appears in the above statement, the building committee, as such committee, in the year 1831, and soon after the purchase of the stores, gave to him a promissory note for the sum of $1,376. At the time of giving the note there remained in the hands of the society's fund commissioner notes to the amount of $943.69 belonging to the fund. On the 8th of March, 1832, the society voted "that all the

income from the stores belonging to the society, exceeding $400, be annually applied to the payment of the debt incurred by the society in purchasing and repairing the building north of the meeting house, until the principal and interest of said debt be paid." No part of the store rents received after this vote, and before the last payment for the purchase of the property, was applied to pay for repairs upon the stores.

Upon this note to Daniel Wadsworth the society paid on the 2d of June, 1832, the sum of $450, which was the sum received on the day next previous from the sale of a conference house situated on Temple street in Hartford, which belonged to and was sold by the church connected with the society for that sum, which house had been purchased by the church, as distinguished from the society, with church funds, pursuant to a resolve of the legislature authorizing the members of the church in the First Society in Hartford to purchase a lot with a building thereon north of Theater street in Hartford, passed May, 1814, as follows: "Resolved by this Assembly, That the members of the church of Christ in the First Ecclesiastical Society in the town of Hartford, be allowed to purchase and take by deed the lot and building in said petition described, and to hold the same to them and their successors forever, subject to the superintendence of the present and all successive ministers in said church and society." This conference house was conveyed to the members of the church by warranty deed, dated the 10th day of April, 1815, and from the time when the church received the deed the property was held and used for church purposes. On the 23d of March, 1831, the same committee which had been appointed by the society, and which is above called the building committee, was appointed a committee of the church, and was authorized and empowered by the church to sell the church conference house property, and apply the avails towards the payment for the property which the society was about to purchase of Wadsworth and Terry.

On the 9th of January, 1835, the sum due to Daniel Wadsworth upon the note of $1,376, given by the building committee, was $1,071.16, and on that day the society voted to

authorize its treasurer to give to Daniel Wadsworth a note of the society signed by its treasurer for the balance due him, in place of the note of the building committee, and on the following day the treasurer gave Wadsworth a note for $971.16, being the aforesaid balance less a subscription of $100 made by Wadsworth in 1831.

The subscriptions of $100 each made by Terry and Wadsworth were part of $2,650 which was subscribed in the year 1831, by sundry persons, " toward completing the payment of the property purchased of Messrs. Wadsworth and Terry, for the use of the First Ecclesiastical Society in Hartford, and for altering and repairing the building for the accommodation of the Sunday school and other meetings of the society." Of this amount of $2,650, about $100 was expended in repairs and alterations of the stores soon after they were purchased. No part of the money so subscribed was used in payment for the property, unless the subscriptions of Wadsworth and Terry are to be regarded as so used. The note of $971.16 which was given to Daniel Wadsworth was paid by the society, with $22.66 interest then due thereon, on the 21st of May, 1836. These payments were made from the funds from various sources in the hands of the treasurer of the society, of which $431.25 had been received during that year from store rents above $400 per year, and from collections made from the fund aforesaid.

After the giving of the note of $1,376 by the building committee, and before the payment of the note for $971.16, the treasurer of the society had from time to time received from the avails of the notes remaining in the hands of the fund commissioner the amount of 537.20, and had also received from the store rents in excess of $400 per year, after the passing of the vote of March 8th, 1832, respecting the store rents, and up to the date of payment of the note of $971.16, the sum of $526.25, making the whole sum from fund and store rents $1,063.45, but the store rents and the sum received from the fund were paid to the society treasurer from time to time, and went into his general account, and were not kept distinct from other monies in his hands.

At the beginning of the year 1836 the society had a balance of money on hand of only thirty-nine cents.

During the years 1838, 1839, and 1840, and after the payment of the note of $971.16, the treasurer of the society received from the fund aforesaid, in addition to the sums previously realized from the fund, the sum of $259.62. This fund was never taxed prior to the time of the purchase of the stores. The stores have always been rented from year to year, and all the income from them, consisting of annual rents, except what was used to pay for them, if any is to be regarded as having been so used, has always been paid into the general account of the society's treasurer, and has all been applied, in the same manner with the other income of the society, to paying the regular expenses of the society. From 1831 to 1836 inclusive the store rents amounted to about $533 per year, on an average, equal rent having been received from each store.

On the 29th of December, 1820, the society passed the following vote : " That some meet person be annually appointed, to be styled the fund commissioner, whose duty it shall be to take possession of and keep all the notes, deeds, certificates of bank stock, and all other papers relating to the permanent fund of the society, to keep a register of said notes, and annually to collect the interest and receive the dividends as they shall grow due on said fund, and pay over the same to the treasurer of this society. Also, by and with the advice of the society's committee, to collect and secure such of said notes from time to time as may be deemed expedient, and invest the same in bank stock, or loan the same on good security, and generally to manage the concerns of said fund so as best to promote the good of this society, and carry into effect the intention of the donors, and the act of Assembly whereby it is provided that said fund shall be permanent, and no part of the principal sum shall be expended or impaired, and that said commissioner shall every year lay before the society at the annual meeting a detailed statement, showing the condition of said fund, what the same consists of or how it is invested, what sums have been collected and paid over as interest,

amount of dividends received and paid over on bank stock, and on what notes (if any) there shall be arrears of interest, stating from whom interest is due and how much, which account shall be previously audited."

On the 8th of March, 1832, the society voted, " That the fund commissioner be and he is hereby authorized and directed to collect or dispose of the notes belonging to the society as a part of their fund, and to indorse over said notes, if necessary, and apply the avails thereof toward payment of the note given to Daniel Wadsworth for the building and land purchased of him." On the 9th of January, 1833, the society voted, " That the office of fund commissioner be abolished, and that the society's committee be authorized to receive the notes and securities belonging to the society as part of their fund in the hands of the late commissioner, and to dispose of the same, and to indorse said notes, if necessary, and to apply the avails toward payment of the debt due for the building purchased of D. Wadsworth."

The salary paid by the society to its minister has in every year, since and including the year 1803, exceeded in amount the income annually derived from the fund before the purchase of the stores, or from the rent of the stores since the purchase.

*J. C. Day* and *Stanton,* for the plaintiff.

The fund of $7,364 established by the private act of 1803 was exempt from taxation under the act of 1702. This exemption still attaches to the fund, or to any property in which it is invested, unless the exemption has been taken away by some change in the law, or lost by some act of the society. Neither of these events has occurred.

1.   No such change in the law has been made as to take away this exemption.   The act of 1702, so far as it relates to property now in the hands of religious societies, the income of which is still devoted to pious uses, has never been repealed. True, the exemption clause was omitted in the revision of 1821, but a clause was appended to the repealing act saving all rights, privileges and immunities granted to, and vested

in any person or body corporate by virtue of the laws repealed. This saving clause was intended to preserve such rights as those now in question, among others, and the omission of the exemption clause was intended to affect only estates granted subsequently to the time when the revision of 1821 should take effect. The revision of 1821 carefully distinguishes between estates in the hands of the original donees, and still devoted to pious uses, and estates which had been conveyed into other hands, and devoted to other uses. It taxes the latter, while leaving the former untaxable. The legislature did not intend by the acts of 1821, nor by any subsequent act, to tax estates given and still held *in pios usus* in the hands of the original donee. This is evident from the acts of 1821 when taken together, and appears still more plainly from the edition of 1824, in which lands subject to taxation are enumerated, and lands of the class in question are omitted, while lands given in the same way, but leased for long terms at a nominal rent, are included. This distinction is clearly made in the general statutes down to the present time; and is inconsistent with the claim made by the defendant, that the legislature intended to tax such estate in the hands of the original donees ; the making of this distinction being equivalent to an express declaration that such estate while so held is exempt.

The same distinction applies to personal estate given and held *in pios usus*. *Atwater* v. *Town of Woodbridge*, 6 Conn., 223, concurred in by Judge CHURCH in his dissenting opinion in *Landon* v. *Town of Litchfield*, 11 Conn., 269, and no where questioned. The argument of Judge SHERMAN, and the opinion of the court in *Atwater* v. *Town of Woodbridge*, make the same distinction. The court expressly declares that it was not the intention of the legislature to subject to taxation property granted for pious uses, and still held by the original donees, and this part of that decision has never been overruled or questioned. In none of the cases decided since *Atwater* v. *Woodbridge* has the contrary claim been recognized. *Osborne* v. *Humphrey*, 7 Conn., 340 ; *Parker* v. *Redfield*, 10 id., 495, 490 ; *Landon* v. *Town of Litchfield*, 11 id., 260 ;

*Hart* v. *Town of Cornwall,* 14 id., 233, 228; *Seymour* v. *Town of Hartford,* 21 id., 486, 481; *Town of New Haven* v. *Sheffield,* 30 id., 170, 160; *Brainard* v. *Town of Colchester,* 31 id., 410, 407; *Lord* v. *Town of Litchfield,* 36 id., 116.

We claim that the act of 1859 clearly shows that lands which have not been conveyed by any instrument "intended to be a perpetual conveyance," and from which the society does "receive an annual income or rent," are exempt. Public Acts, 1859, ch. 61; Gen. Stat., page 707, sec. 6. The acts of 1821, 1824, and 1859, and the decisions in *Brainard* v. *Colchester,* and *Lord* v. *Litchfield,* were aimed at those instances of long leases which were mere evasions of the act of 1702.

2. The society has not lost the exemption by any act of its own. By the act of 1803 the exemption was not made to depend upon the form of investment. The claim made by the defendant, that an investment of the fund in bank stock or real estate was contrary to the act, is without foundation. The funds have not been mingled and confused with other taxable property. The real estate in question was wholly paid for with funds which were exempt under the act of 1702. The $450 derived from the sale of a house of religious worship, which had been purchased with church funds and conveyed to the church for religious uses as early as 1819, was clearly untaxable under the law of 1702. *Parker* v. *Redfield, supra.* The income from said property has always been "appropriated for the support of the gospel ministry in said society," within the meaning of the private act of 1803. The circumstance that the real estate was not wholly paid for at the date of the purchase is entirely immaterial. At all events, the store purchased of Nathaniel Terry was paid for out of the fund at the time of purchase. If one store was untaxable, the assessment was void as to that one, but if the assessment was void as to any part it was void altogether, and the plaintiff is entitled to recover. *Hubbard* v. *Brainard,* 35 Conn.. 563.

*H. H. Barbour* and *H. S. Barbour,* for the defendant.

1.   The property in question is not exempt from taxation by the provisions of Gen. Stat., tit. 64, ch. 1, sec. 6.  It is taxable under section 7.   It will not be claimed by the plaintiff that the stores are " exclusively occupied," as " a church." The application of the rents of the stores to " paying the regular expenses of the society," does not render them exempt from taxation as being " used exclusively for religious purposes."   The term " used" must be construed to be synonymous with occupied, and not to include the appropriation of the income of buildings ; otherwise, " scientific," " literary" and " benevolent," as well as " ecclesiastical", institutions may hold such property to an unlimited extent, free from taxation. This would be grossly contrary to public policy.  *Brainard* v. *Town of Colchester*, 31 Conn., 410, 407.

2.   If it is claimed by the plaintiff that the stores are exempt by reason of the Statute of 1702, we answer :

They were not " given and granted" " for the maintenance of the ministry of the gospel," but were purchased by the society, by absolute deed in the usual form of warranty deeds ; the price paid being $7,700.  *Seymour* v. *Town of Hartford*, 21 Conn., 486, 488, 481.  They were not paid for by property of the society that had been so " given and granted."   None of the money in which payment was made can be traced to donations " for the maintenance of the ministry of the gospel," unless it be a part of the first item.   The Phœnix Bank stock was bought in 1823, and $6,200 was paid therefor from a fund created in 1802–3. $4,614 of this fund was given on condition that the principal should be kept " on loan" perpetually, and the " interest" thereof, when the fund amounted to $7,000, was " to be appropriated and applied for the support of the ministry of the gospel."   The amount of $2,750 previously belonging to the society, which went into this fund, is not found to have been " given for the maintenance of the ministry of the gospel." Nor was the conference house.   It was purchased by the church.

We claim in regard to the donation of $4,614, that it is

not an " estate" to be found in these " stores," because first, it has been confused over and over again with other estate, by the act of the plaintiff; second, by the very conditions of the gift, it was to be kept " on loan" perpetually, and the plaintiff cannot be permitted to claim that it now has the form of realty. A law providing exemption from taxation is to receive a very strict construction. 10 Amer. Law Reg. (N. S.), August, 1871, p. 504. *Brainard* v. *Town of Colchester, supra.*

The statute of 1702 was repealed in 1821.

SEYMOUR, J.   The question in this case is whether certain real estate of the plaintiff situate in Hartford is or is not liable to taxation. A tax was assessed upon it by the town and collected by compulsory process, and this action is brought to recover the money so collected.

The property is claimed to be exempt from taxation under the act of 1702. This act is as follows : " *Be it enacted,* &c., " That all such lands, tenements, hereditaments, and other estates, that either formerly have been or hereafter shall be given and granted, either by the General Assembly of this colony, or by any town, village, or particular person, for the maintenance of the ministry of the gospel in any part of this colony, or schools of learning, or for relief of poor people, or for any other public or charitable use, shall forever remain and be continued to the use or uses to which such lands, tenements, hereditaments, or other estates, have been or shall be given and granted, according to the true intent and meaning of the grantors, and to no other use whatever : and also be exempted out of the general lists of estates, and free from the payment of rates."

Until 1821 this act continued in full force, having been reenacted in the same words in all the prior revisions of the statutes. In 1821 the clause exempting from taxation is omitted, the residue of the act being in substance retained, with slight change of phraseology. The revision of 1821 contained the following provisions: First, that all statute laws of the state, other than the acts of 1821, be repealed. " Provided nevertheless, that all rights, privileges and im-

munities granted to and vested in any persons or body corporate by virtue of the laws hereby repealed, shall remain unimpaired and unaffected by such repeal." Second, that all real and personal property shall be valued and set in the list in the manner particularly specified in the act concerning taxes ; under which specifications is the following : " Lands &c. which have heretofore been granted or sequestered for the use of schools, or other public or pious uses, and which have been leased or let for terms of time not yet expired, at rents merely nominal, shall be valued and assessed at such rate and proportion as, regarding the duration of the lease, the rent now actually paid and applied to such public uses bears to the whole actual value."

The effect of these provisions of the revision of 1821 became the subject of litigation in 1826, in the case of *Atwater* v. *Woodbridge*, 6 Conn., 223. The question before the court was whether an old fund belonging to a religious society was taxable, the fund being lent and on interest, and the income faithfully devoted to the pious uses for which it had been given. Judge BRAINARD giving the opinion of the court says, " In no act of the legislature do I find the statute of 1702 repealed, certainly not expressly, and I think not by any fair implication." He further says, " I cannot for a moment believe that the legislature ever intended to interfere with the rights given and acquired under the statute, but if they did, I will with deference, but with boldness, say they had no constitutional power to effect it. It appears to me that property given under the statute, so long as it is applied to the uses designated, must forever retain the rights and privileges attached to it at the time of the grant."

In the case of *Landon* v. *Litchfield*, 11 Conn., 269, Judge CHURCH, in commenting on the case of *Atwater* v. *Woodbridge*, treats the decision as founded upon the proposition that the statute of 1702 was not repealed in respect to estates given and still held for pious uses in the hands of the donee. And an examination of that case clearly shows, we think, such to have been the ruling of the court. This decision has never to our knowledge been questioned, either in the courts or in

practice.    These ancient funds, while applied to the uses designated, have been regarded as exempt from the payment of rates, and treated accordingly.

It is not important to vindicate this ruling in *Atwater* v. *Woodbridge.*   It is conceded that now, under the decision of this court in the late case of *Lord* v. *Litchfield,* such funds may be taxed whenever the legislature sees fit to express its will to that effect.   So that the only question is whether the will of the legislature has been so expressed or not, and upon the simple question of the construction of ancient statutes, we should feel bound to yield to authority, unless clearly convinced that such authority was manifestly erroneous.

The legislature in 1821 undoubtedly intended to tax estates once conveyed to public uses, which had been conveyed away and devoted to other uses, as is clearly shown by the provisions above recited regarding such lands which had been leased at rents merely nominal.   And the fact of such special provision in relation to lands thus diverted from their proper object, implies that lands not thus diverted were to remain exempt.

Our courts, acting upon the idea that the act of 1702 is in the nature of a contract, and protects from taxation all lands once granted to public uses, went so far as to hold in the case of *Landon* v. *Litchfield,* that the land in the hands of lessees at nominal rents was exempt, the express provisions of the statute to the contrary notwithstanding.   But in 1866 the case of *Landon* v. *Litchfield* was overruled in its application to long leases.   *Brainard* v. *Colchester,* 31 Conn., 407.   And finally, in the case of *Lord* v. *Litchfield,* 36 Conn., 116, the exemptions of the act of 1702 were held subject to legislative control.

The law then as settled by authority on this vexed question is now as follows :

1.   It is not doubted that by the revision of 1821 all property thereafter conveyed to public uses is subjected to taxation.

2.   As to property conveyed to public uses before 1821, it may be taxed if the legislature chooses to subject it to taxation, but such property is left by the acts of 1821 under the

protection of the statute of 1702, so long as it is faithfully appropriated to its designated use.

The question remains to be decided whether, since the revision of 1821, these ancient funds, while faithfully applied to their trust, have been by the legislature subjected to taxation.

We think they have not. The construction given by the court to the acts of 1821 has been publicly known since 1826, and no express repeal of the exemption has been made. The laws concerning the assessments of taxes have undergone frequent changes since 1821, but, as applicable to the matter under consideration, the changes have been slight. The special provision for taxing lands once conveyed to public uses, but since leased at nominal rents, is preserved in a changed form in the act of 1866; the clause now being "that whenever any ecclesiastical society, or other public or charitable institution, shall have leased, or otherwise conveyed, any real estate from which said institution does not receive an annual income or rent, or where such conveyance is intended to be a perpetual conveyance, such estate shall not be exempt from taxation." The implication from this clause in favor of lands not thus leased, is the same as from the like clause in the statutes of 1821. Our present revision also contains the same proviso as that in the acts of 1821, saving such rights and immunities as had become vested by virtue of the laws repealed.

The present revision in general terms subjects to taxation all property not specially exempted, and the revision of 1821 also in its general terms subjected to taxation the property which was the subject of litigation in *Atwater* v. *Woodbridge*.

The case therefore of *Atwater* v. *Woodbridge* seems to govern this case, and we hold that the statutes now in force do not subject to taxation lands, which prior to 1821 were given or granted for the maintenance of the gospel, and which are now devoted to that use.

The question then which next arises is whether any or all the property of the plaintiff which was assessed is entitled to exemption under this rule. The fund raised by subscription December 6th, 1802, was clearly within the statute of 1702, and this fund, together with the fund

which formerly belonged to the society, was by resolution of the General Assembly at its May session, 1803, to be kept entire as a society fund, the interest thereof to be appropriated for the support of the gospel ministry in said society, and to be a perpetual fund. A considerable part of this fund was first invested in Phœnix Bank stock, and afterward in the stores which are the subject of dispute in this case.

The store purchased of Mr. Terry for $4,000 was paid for wholly by the proceeds of this fund. That store is therefore subjected to the original trust of being a perpetual fund for the support of the gospel ministry in said society. It is said that the deed to the society is in the usual form, and does not indicate the trust; but the trust attaches itself in fact to the property, and the society, acknowledging the obligation of the trust, devotes the rents to the uses intended. It was said in argument that the rents were appropriated to the general purposes of the society, and it is true they are not specifically and distinctly applied to the support of the ministry, but we think the income is being used in substantial conformity with the trust, and that the Terry store is exempt from taxation under the laws as now existing.

The Wadsworth store was largely paid for by old funds exempt from taxation, but other funds not exempt were used in the purchase, and the different funds have been so mingled and confused that this store was the proper subject of assessment and taxation. Among other funds used in payment for the Wadsworth store, $450 was derived from the sale of a conference house belonging to the church as such. This fund was not prior to 1821 given as a permanent fund, with intent that it should remain forever to charitable uses, and was therefore not within the provisions of the act of 1702, either as a permanent trust, or as exempt from taxation. The church dealt with the property as their own, to sell and dispose of at their pleasure, as they did. Other of the funds used in payment of the Wadsworth store are still less within the provisions of the act of 1702.

We therefore advise that the Terry store is exempt, and

that the Wadsworth store is not exempt; and upon the principle adopted in the case of *Hubbard* v. *Brainard*, 35 Conn., 563, that judgment be rendered for the plaintiff to recover the amount paid the defendant as tax on said stores.

In this opinion the other judges concurred.